542 A.2d 399
David Allen ERDMAN
v.
STATE of Maryland.
No. 1535, Sept. Term, 1987.
Court of Special Appeals of Maryland.
June 13, 1988.

Mark Colvin, Asst. Public Defender (Alan H. Murrell, Public Defender on the brief), Baltimore, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Sandra A. O'Connor, State's Atty. for Baltimore County and Mickey Norman, Asst. State's Atty. for Baltimore County on the brief, Towson), for appellee.

Argued before WILNER, GARRITY and ROSALYN B. BELL, JJ.

WILNER, Judge.

David Allen Erdman was convicted by a jury in the Circuit Court for Baltimore County of robbery with a deadly weapon, breaking and entering, battery, and false imprisonment, for which he received a substantial prison sentence.

Although there was some quibbling over a few of the details, Mr. Erdman essentially conceded that he, in fact, did most of the things that led to the charges against him: that, on November 10, 1985, he accosted Ms. H in front of her apartment, tied her hands, and, brandishing a gun of some sort—whether toy or real was in dispute—stole her purse; that, on November 17, 1985, he broke into the apartment of Ms. C, but, upon discovery by a friend of Ms. C, left without taking anything; and that, on December 1, 1985, he lured Ms. D to a supposed job interview, tried to persuade her to undress for a physical examination, briefly touched her shoulder, pushed her into a chair, and momentarily prevented her from leaving.

While Mr. Erdman pled not guilty to the charges and did dispute some of them, his principal defense was non-responsibility, i.e., because of a mental disorder, he lacked substantial capacity to conform his conduct to the requirements of law. See Md.Code Ann.Health–Gen. art., § 12–108(a) (Supp.1987). The State did not really dispute that Erdman

had a mental disorder. All of the doctors agreed that he suffered from paraphilia, with fetishistic and/or transvestite features. He liked to dress as a woman and had recurrent urges to place women in bondage or in positions of subjugation.[1] The issue, then, centered on whether, by reason of this disorder, he lacked substantial capacity to conform his conduct to the requirements of law.

In furtherance of this defense, Erdman (1) asked for an instruction that:

"If the defendant is found not criminally responsible, the court will commit the defendant to the Department of Health and Mental Hygiene for institutional inpatient care. In the future, the defendant will be entitled to [be] release[d] from custody of the Department of Health and Mental Hygiene only if this court or a jury finds he will not be a danger to himself or the person or property of another."

(2) renewed that request following the opening portion of the prosecutor's closing argument, and (3) asked for the opportunity to make the final closing argument on the issue of criminal responsibility.

The court denied all three requests; hence, this appeal.

*(1) The Instruction—Initial Request*

In the circumstances of this case, the proposed instruction appears to be a correct summary of what would have happened to Erdman if he had been found not criminally responsible. The State makes no contrary contention. The issue, then, is not the correctness of the instruction but its relevance.

With limited exceptions, such as in the meting out of capital punishment, it has not been the function of juries to decide upon or concern themselves with the penalty that may be imposed or actually inflicted upon a defendant

---

1. On each of the three occasions noted, he was dressed in woman's clothing.

following conviction.[2] The jury's traditional role is simply to decide guilt or innocence or, where "insanity" or non-responsibility has been asserted, whether the defendant meets the statutory test for that status. Normally, then, juries are not informed and are not required to be informed as to the possible sentences that may be imposed, much less whether they will be concurrent or consecutive to other sentences to which the defendant may be subject, or what the prospects may be either for suspension of all or part of the sentence in favor of probation or for early release on parole.

In keeping with that principle, courts traditionally have declined to instruct juries on the consequences that would follow from a verdict of "insanity" or non-responsibility. See, for example, *State v. Wade*, 96 Conn. 238, 113 A. 458, 460 (1921):

> "The jury determines the guilt or innocence of the accused; the court pronounces sentence. If the jury find[s] an accused guilty as charged, but are not satisfied beyond a reasonable doubt of the sanity of the accused at the time of the charge, their verdict should be, 'Not guilty upon the ground of insanity.' With the rendering of the verdict the duty and responsibility of the jury ends. The enforcement of the verdict by the pronouncement of sentence and the rendition of judgment is a duty resting wholly with the court. It will not help the jury in the performance of their duty to know what the penalty may be, nor what disposition will be made of the accused."

See also *State v. Daley*, 54 Or. 514, 103 P. 502 (1909), and *cf. State v. Barnes*, 54 Wash. 493, 103 P. 792 (1909).

It does not appear, even in the early days, that this was a rule absolutely forbidding such an instruction but rather one making clear that the instruction was not required.

---

2. Even in a capital punishment case, the jury does not consider sentence until after guilt of a capital offense has been determined. The sentencing phase is an entirely separate proceeding and need not be before the jury that convicted the defendant. See Md.Code Ann. art. 27, § 413.

Some courts, under some circumstances, *did* tell the jury that a finding of insanity would not necessarily result in the defendant's release from restraint, and the giving of such an instruction was not held to be error. The Connecticut Court in *Wade, supra,* for example, noted the giving of such an instruction where both the guilt and the insanity of the defendant seemed clear and observed, 113 A. at 460:

> "Usually where this instruction is given it is with the purpose on the part of the judge that the jury may not find an insane person guilty, but guilty [*sic,* not guilty?] on the ground of insanity. Whether such an instruction shall be given is for the trial judge to determine in the exercise of his sound discretion."

In 1955, the U.S. Court of Appeals for the D.C. Circuit began somewhat of a countermarch on this issue. In *Taylor v. United States,* 222 F.2d 398 (D.C.Cir.1955), an appellant, whose sole defense was insanity, claimed that the judge improperly told the jury that, if acquitted, he would go free. Although finding no merit to that claim, the Court, without benefit of either precedent or extended reasoning, held, at 404:

> "[W]e think that when an accused person has pleaded insanity, counsel may and the judge *should* inform the jury that if he is acquitted by reason of insanity he will be presumed to be insane and may be confined in a 'hospital for the insane' as long as 'the public safety and ... [his] welfare' require. Though this fact has no theoretical bearing on the jury's verdict it may have a practical effect."

(Emphasis added.)

Two years later, in *Lyles v. United States,* 254 F.2d 725 (D.C.Cir.1957), *cert. denied* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), the same court, in a 6–3 *en banc* decision, confirmed the *Taylor* holding and provided a more detailed basis for it. The trial court in *Lyles* had given the disputed instruction, telling the jury that, if found insane, the defendant would be committed to St. Elizabeth's Hospital where he would remain until cured "and it is deemed

safe to release him." *Id.,* 728. As Lyles was, in fact, convicted of the charges against him and made no challenge to the correctness of the instruction, it is not altogether clear why the Court chose to consider the instruction, but it did clearly announce its views on the matter.

The Court began by acknowledging the doctrine "well established and sound, that the jury has no concern with the consequences of a verdict..." but concluded that that doctrine did not apply in the context of an insanity plea:

"The issue of insanity having been fairly raised, the jury may return one of three verdicts, guilty, not guilty, or not guilty by reason of insanity. Jurors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty. It is common knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose. But a verdict of not guilty by reason of insanity has no such commonly understood meaning. As a matter of fact its meaning was not made clear in this jurisdiction until Congress enacted the statute of August 9, 1955. It means neither freedom nor punishment. It means the accused will be confined in a hospital for the mentally ill until the superintendent of such hospital certifies, and the court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others. We think the jury has a right to know the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts."

(Footnote omitted.) *Id.*

Though eschewing any prescribed form of instruction, the Court discouraged any "recitation of the statutory procedure in great detail" and opted instead for simply explaining that, in the event of a finding of insanity, the defendant would be confined in a hospital until the court was satisfied that he had recovered his sanity and was no longer dangerous, whereupon he would be released, either conditionally or

unconditionally. The Court's final conclusion, expressed at 728–29, was:

"Sometimes a defendant may not want such an instruction given. If that appears affirmatively on the record we would not regard failure to give it as grounds for reversal. Otherwise, whenever hereafter the defense of insanity is fairly raised, the trial judge shall instruct the jury as to the legal meaning of a verdict of not guilty by reason of insanity in accordance with the view expressed in this opinion."

(Footnote omitted.)

Three judges dissented from this part of the opinion. Their view—the more traditional one—was that:

"The issue of insanity, fairly raised, does no more than present another factual question to the jury: whether the defendant was mentally responsible when the criminal act was done. That issue also should be determined on the basis of the evidence only and, in deciding it, the jury should not be influenced by a consideration of the result of an acquittal by reason of insanity; that is an extraneous consideration wholly unconnected with the evidence from which the jury must reach a determination of the factual issue raised concerning the defendant's mental condition.

In short, the jury should be told nothing as to how the defendant will be dealt with in case of acquittal by reason of insanity."

*Id.,* 733.

The majority opinion in *Lyles* served, at least, to focus renewed attention on this issue. Since 1957, nearly every State and several Federal circuits have considered, or reconsidered, the propriety of giving this kind of instruction; law review articles have been written about it; and the American Bar Association, through its Criminal Justice Mental Health Standards, has taken a position on it. Periodically, courts and commentators have endeavored to assess where the majority lies, but those assessments tend to become

outdated. See, for example, Annot., *Instructions In Criminal Case In Which Defendant Pleads Insanity As To His Hospital Confinement In The Event Of Acquittal*, 11 A.L.R.3d 737 (1967); *People v. Moore*, 166 Cal.App.3d 540, 211 Cal.Rptr. 856 (1985); ABA Criminal Justice Mental Health Standards, Commentary b Standard 7–6.8.

A current review of the case law indicates that a majority of the Federal and State jurisdictions have not accepted the *Lyles* analysis and have continued to adhere to the view that the post-verdict disposition of the defendant is, and should be, of no concern to the jury.

We have found no Federal appellate decision outside of the D.C. Circuit that has followed the mandate of *Lyles.* Indeed, the Third, Fifth, Sixth, Seventh, Eighth, and Tenth Circuit Courts of Appeals have declined to reverse judgments because of a refusal to instruct on the consequences of a verdict that the defendant was insane.[3] The relevance of these Federal decisions to the case at bar may be somewhat attenuated, however, as most of them rested on the premise that, outside of the D.C. Circuit, where a specific commitment procedure was provided by statute, it was unclear what would, in fact, happen to the defendant if found to be "insane" (i.e., not guilty by reason of insanity). With the enactment of P.L. 98–473, § 403 (18 U.S.C. § 4243) in 1984, there is now a commitment procedure applicable in all Federal circuits; whether that will cause the Federal courts to alter their view of the D.C. Circuit approach is not yet clear.

-------

**3.** See *United States v. Alvarez,* 519 F.2d 1036 (3d Cir.1975); *Government of Virgin Islands v. Fredericks,* 578 F.2d 927 (3d Cir.1978); *Pope v. United States,* 298 F.2d 507 (5th Cir.1962); *White v. United States,* 387 F.2d 367 (5th Cir.1967); *United States v. McCracken,* 488 F.2d 406 (5th Cir.1974); *United States v. Gay,* 522 F.2d 429 (6th Cir.1975); *United States v. Greene,* 497 F.2d 1068 (7th Cir.1974), *cert. denied* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *Pope v. United States,* 372 F.2d 710 (8th Cir.1967), *vac. on other grounds* 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); *Apgar v. United States,* 440 F.2d 733 (8th Cir.1971); *Powers v. United States,* 305 F.2d 157 (10th Cir.1962); *United States v. Borum,* 464 F.2d 896 (10th Cir.1972).

Among the States, as best we can discern, it appears that 11 States, by judicial action, have followed the *Lyles* approach at least to the extent of requiring a judge to instruct on the consequences of a verdict of "insanity" or non-responsibility when such an instruction is requested by the defendant.[4] Two States have *recommended* that such an instruction be given on the defendant's request but apparently have not regarded the failure to give it as necessarily constituting reversible error.[5]

The courts taking this view recognize that it represents a departure from the general notion that the consequences of a verdict are not a proper consideration for the jury but express concern that, in this one area, juries do indeed give thought to those consequences, a concern given some basis of support in H. Weihofen, *Procedure For Determining Defendant's Mental Condition Under The American Law Institute's Model Penal Code,* 29 Temp.L.Q. 235, 247 (1956). Thus, the Colorado Court, in reversing its earlier

---

**4.** Alaska (*Schade v. State,* 512 P.2d 907 (Alaska 1973)); California (*People v. Moore,* 166 Cal.App.3d 540, 211 Cal.Rptr. 856 (1985), *People v. Dennis,* 169 Cal.App.3d 1135, 215 Cal.Rptr. 750 (1985)); Colorado (*People v. Thomson,* 197 Colo. 232, 591 P.2d 1031 (1979), *People v. Roark,* 643 P.2d 756 (Colo.1982)); Florida (*Roberts v. State,* 335 So.2d 285 (Fla.1976), *Isley v. State,* 354 So.2d 457 (Fla.App.1978)); Louisiana (*State v. Babin,* 319 So.2d 367 (La.1975), *State v. Bennett,* 345 So.2d 1129 (La.1977)); Massachusetts (*Commonwealth v. Mutina,* 366 Mass. 810, 323 N.E.2d 294 (1975), *Com. v. Callahan,* 380 Mass. 821, 406 N.E.2d 385 (1980)); Nevada (*Kuk v. State,* 80 Nev. 291, 392 P.2d 630 (1964), *Bean v. State,* 81 Nev. 25, 398 P.2d 251 (1965), *cert. denied* 384 U.S. 1012, 86 S.Ct. 1932, 16 L.Ed.2d 1030 (1966)); New Jersey (*State v. Krol,* 68 N.J. 236, 344 A.2d 289 (1975), *Williams v. Page,* 160 N.J.Super. 354, 389 A.2d 1012 (App.), *cert. denied,* 78 N.J. 395, 396 A.2d 582 (1978)); North Carolina (*State v. Hammonds,* 290 N.C. 1, 224 S.E.2d 595 (1976), *State v. Adcock,* 310 N.C. 1, 310 S.E.2d 587 (1983)); Pennsylvania (*Com. v. Mulgrew,* 475 Pa. 271, 380 A.2d 349 (1977), *Com. v. McCann,* 503 Pa. 190, 469 A.2d 126 (1983)); and West Virginia (*State v. Nuckolls,* 166 W.Va. 259, 273 S.E.2d 87 (1980), *State v. Daggett,* 167 W.Va. 411, 280 S.E.2d 545 (1981)).

**5.** New Hampshire (*Novosel v. Helgemoe,* 118 N.H. 115, 384 A.2d 124 (1978), *State v. Lister,* 122 N.H. 603, 448 A.2d 395 (1982)); and Wisconsin (*State v. Shoffner,* 31 Wis.2d 412, 143 N.W.2d 458 (1966), *Simpson v. State,* 62 Wis.2d 605, 215 N.W.2d 435 (1974)).

view that instructions of this type should not be given, observed in *People v. Thomson*, 197 Colo. 232, 591 P.2d 1031, 1032 (1979):

> "Recent studies and cases have recognized that today's juries are distracted from their fact finding function by their concern that a defendant will be returned to the community at large if found not guilty by reason of insanity. . . .
>
> .     .     .     .     .
>
> We find the *Lyles* reasoning persuasive and, to the extent that *Ingles* is inconsistent, it is overruled.  We realize that the challenged instruction in this case might possibly influence the jury toward a result-oriented verdict.  This must be balanced by the possible miscarriage of justice if, in the mistaken belief that as a result of an insanity verdict the accused will be returned to the community, the jury rejects such a verdict on that account and later finds the accused guilty.  This possibility should be negated by a jury instruction which clearly and simply explains the consequences to the defendant of an insanity verdict.  Such an instruction should clearly indicate that it is only informational and is to have no persuasive bearing on the jury's determination of a proper verdict under the evidence."

See also the extended discussion in *People v. Moore*, 166 Cal.App.3d 540, 211 Cal.Rptr. 856 (1985).  A similar view was once taken by the Supreme Court of Michigan.  In *People v. Cole*, 382 Mich. 695, 172 N.W.2d 354, 366 (1969), that Court observed:

> "This appeal makes it mandatory that this Court choose between: 1) the possible miscarriage of justice by imprisoning a defendant who should be hospitalized, due to refusal to so advise the jury;  and 2) the possible 'invitation to the jury' to forget their oath to render a true verdict according to the evidence by advising them of the consequence of a verdict of not guilty by reason of insanity.

We conclude that the reasons given in support of the first proposition far outweigh the fear of jury integrity expressed in the second proposition."

It is interesting to note, however, that the Michigan Court has more recently reconsidered that view. In *People v. Goad*, 421 Mich. 20, 364 N.W.2d 584 (1984), the Court observed that, by reason of statutory changes, the law governing the disposition of nonresponsible defendants had become more complex and thus held that "because of the numerous possible contingencies under the statutory scheme, 'no instruction could adequately postulate the impact of such a verdict on the appellant's future tenure in the institution.' " *Id.*, 364 N.W.2d at 589–90.

In six States, an instruction of this type is required by statute.[6] In three of those States—Georgia, Missouri and New York—the statute in effect reversed judicial decisions holding that the instruction was not required.[7]

In contrast, 29 States have rejected the *Lyles* approach and continue to hold that an instruction on the consequences of a finding of non-responsibility either should not

---

**6.** Georgia (Ga.Code Ann. § 17–7–131(b)(3) (1987 Supp.), *Keener v. State*, 254 Ga. 699, 334 S.E.2d 175 (1985)); Hawaii (Haw.Rev.Stat. § 704–402(2) (1985), *State v. Amorin*, 58 Haw. 623, 574 P.2d 895 (1978)); Kansas (Kan.Stat.Ann. § 22–3428(6) (1987 Supp.), *State v. Hamilton*, 216 Kan. 559, 534 P.2d 226 (1975), *State v. Alexander*, 240 Kan. 273, 729 P.2d 1126 (Kan.1986)); Missouri (Mo.Stat.Ann. § 552.030(6) (Vernon 1987), *State v. Pike*, 516 S.W.2d 505 (Mo.App. 1974)); New York (N.Y.Crim.Proc.Law § 300.10(3) (Consol.1986), *People v. Bassik*, 53 N.Y.2d 1032, 442 N.Y.S.2d 485, 425 N.E.2d 873 (1981)); and Tennessee (Tenn.Code Ann. § 33–7–303(e) (1984), *State v. Vanzant*, 659 S.W.2d 816 (Tenn.Cr.App.1983), *permission to appeal denied* 659 S.W.2d 816 (Tenn. Oct. 11, 1983)). The Florida decisions were, in part, based on a Rule of Procedure requiring the judge to instruct the jury as to the "penalty fixed by law for the offense for which the accused is then on trial." *Roberts v. State, supra*, 335 So.2d 285 at 289.

**7.** See *Keener, supra*, 334 S.E.2d 175; *State v. Garrett*, 391 S.W.2d 235 (Mo.1965); *People v. Adams*, 26 N.Y.2d 129, 309 N.Y.S.2d 145, 257 N.E.2d 610 (1970).

or need not be given.[8]  Most, though not all, of the courts

8. Alabama (*Gray v. State*, 482 So.2d 1318 (Ala.Cr.App.1985), *cert. denied* 482 So.2d 1318 (Ala. Jan. 31, 1986)); Arizona (*State v. McLoughlin*, 133 Ariz. 458, 652 P.2d 531 (1982)); Arkansas (*Madison v. State*, 287 Ark. 179, 697 S.W.2d 106 (1985)); Connecticut (*State v. Wade*, 96 Conn. 238, 113 A. 458 (1921), *State v. Holmquist*, 173 Conn. 140, 376 A.2d 1111 (1973), *cert. denied* 434 U.S. 906, 98 S.Ct. 306, 54 L.Ed.2d 193 (1977)); Delaware (*Hand v. State*, 354 A.2d 140 (Del. 1976), *Rush v. State*, 491 A.2d 439 (Del.1985)); Idaho (*State v. Gratiot*, 104 Idaho 782, 663 P.2d 1084 (1983)); Illinois (*People v. Meeker*, 86 Ill.App.3d 162, 41 Ill.Dec. 560, 407 N.E.2d 1058 (1980), *People v. Hebein*, 111 Ill.App.3d 830, 67 Ill.Dec. 546, 444 N.E.2d 782 (Ill.App. 1982), *People v. Alerte*, 120 Ill.App.3d 962, 76 Ill.Dec. 452, 458 N.E.2d 1106 (1983), *cert. denied* 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985)); Indiana (*Dipert v. State*, 259 Ind. 260, 286 N.E.2d 405 (Ind. 1972), *Heald v. State*, 492 N.E.2d 671 (Ind.1986)); Iowa (*State v. Hamann*, 285 N.W.2d 180 (Iowa 1979), *State v. Oppelt*, 329 N.W.2d 17 (Iowa 1983)); Kentucky (*Edwards v. Com.*, 554 S.W.2d 380 (Ky.1977), *cert. denied* 434 U.S. 999, 98 S.Ct. 642, 54 L.Ed.2d 495 (1977), *Ice v. Com.*, 667 S.W.2d 671 (Ky.), *cert. denied* 469 U.S. 860, 105 S.Ct. 192, 83 L.Ed.2d 125 (1984)); Maine (*State v. Dyer*, 371 A.2d 1079 (Me.1977), *State v. Condon*, 468 A.2d 1348 (Me.1983), *cert. denied* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984)); Michigan (*People v. Goad*, 421 Mich. 20, 364 N.W.2d 584 (1984)); Minnesota (*State v. Bott*, 310 Minn. 331, 246 N.W.2d 48 (1976), *State v. Larson*, 281 N.W.2d 481 (Minn.), *cert. denied* 444 U.S. 973, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979)); Mississippi (*Smith v. State*, 220 So.2d 313 (Miss.1969)); Montana (*State v. French*, 166 Mont. 196, 531 P.2d 373 (1975), *State v. Caryl*, 168 Mont. 414, 543 P.2d 389 (1975)); Nebraska (*State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (Neb.1979), *cert. denied* 449 U.S. 891–92, 101 S.Ct. 255, 66 L.Ed.2d 120 (1980), *State v. Williams*, 217 Neb. 539, 352 N.W.2d 538 (1984)); New Mexico (*State v. Chambers*, 84 N.M. 309, 502 P.2d 999 (1972), *State v. Lujan*, 94 N.M. 232, 608 P.2d 1114 (1980)); North Dakota (*State v. Huber*, 361 N.W.2d 236 (N.D.), *cert. denied* 471 U.S. 1106, 105 S.Ct. 2339, 85 L.Ed.2d 855 (1985)); Ohio (*State v. Boham*, 29 Ohio App.2d 142, 279 N.E.2d 609 (1971)); Oklahoma (*Boutwell v. State*, 659 P.2d 322 (Okla.Cr.App.1983), *Nauni v. State*, 670 P.2d 126 (Okla.Cr.App.1983)); Oregon (*State v. Segner*, 42 Or.App. 397, 600 P.2d 916 (1979), *State v. Wall*, 78 Or.App. 81, 715 P.2d 96, *cert. denied* 301 Or. 241, 720 P.2d 1280 (Or.1986)); Rhode Island (*State v. Arpin*, 122 R.I. 643, 410 A.2d 1340 (1980)); South Carolina (*State v. Valenti*, 265 S.C. 380, 218 S.E.2d 726 (1975), *State v. Huiett*, 271 S.C. 205, 246 S.E.2d 862 (1978)); South Dakota (*State v. Black Feather*, 249 N.W.2d 261 (S.D.1976), *State v. Robinson*, 399 N.W.2d 324 (S.D.1987)); Texas (*Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977), *Heflin v. State*, 640 S.W.2d 58 (Tex.App.1982)); Vermont (*State v. Smith*, 136 Vt. 520, 396 A.2d 126 (1978), *State v. Percy*, 146 Vt. 475, 507 A.2d 955 (1986)); Virginia (*Rollins v. Commonwealth*, 207 Va. 575, 151 S.E.2d 622 (1966), *cert. denied* 386 U.S. 1026, 87 S.Ct. 1387, 18 L.Ed.2d 469

maintaining this view have acknowledged the *Lyles* approach and have taken some account of the reasons underlying it, but simply found those reasons unpersuasive. A good summary of the objections to *Lyles* is found in *People v. Meeker*, 86 Ill.App.3d 162, 41 Ill.Dec. 560, 567, 407 N.E.2d 1058, 1065 (1980):

"We decline to adopt as a general rule of law a requirement that the jury be given an instruction which relates the consequences of a verdict of not guilty by reason of insanity. Such an instruction would inject into the trial and the deliberations of the jury extraneous and irrelevant matters that would have no bearing on defendant's guilt or innocence. The reason for such a rule urged by defendant, that knowledge of the consequences of such a verdict would prevent the jury from finding a legally insane defendant guilty because he is too dangerous to release, has been successfully urged elsewhere.... But in our view the reasons for refusing such instructions are more persuasive. The jury's verdict should not be influenced by its possible consequences.... Such an instruction invites the jury to reach a compromise verdict, finding defendant not guilty by reason of insanity despite clear evidence of legal sanity because defendant will be incarcerated anyway.... Where the defendant's commission of the act in question and his criminal responsibility are both closely disputed, such an instruction may also tempt the jury to compromise by finding the defendant not guilty by reason of insanity.... It does not appear that requiring such an instruction in all cases involving an insanity defense, or even in close cases, would help the jury reach a true and correct verdict."

(1967), *Spruill v. Com.*, 221 Va. 475, 271 S.E.2d 419 (1980)); Washington (*State v. Barnes*, 54 Wash. 493, 103 P. 792 (1909), *State v. McDonald*, 89 Wash.2d 256, 571 P.2d 930 (1977)); and Wyoming (*Lonquest v. State*, 495 P.2d 575 (Wyo.), *cert. denied* 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972), *Richmond v. State*, 554 P.2d 1217 (Wyo.1976)).

(Citations omitted.) See also *Madison v. State,* 287 Ark. 179, 697 S.W.2d 106, 108 (1985), taking issue with the assumption that jurors are uninformed about the consequences of a finding on non-responsibility:

"Moreover, we think it may have been easier in 1957 to assume, as the *Lyles* majority did, that the public generally is uninformed as to the disposition of someone acquitted by reason of insanity, particularly in light of the suggestion by the court that even the law on the subject was unclear until Congress settled the issue in 1955. But that was thirty years ago and we are unwilling to abandon our precedents on the basis of a pure assumption that the public as a whole is ill-informed on the subject, an arguable point at best. That premise has not gone unchallenged elsewhere."

As we indicated, the American Bar Association, though recognizing that the majority view is otherwise, has recommended the giving of an instruction on the consequences of a verdict of non-responsibility. Standard 7–6.8 of the Criminal Justice Mental Health Standards provides that, "The court should instruct the jury as to the dispositional consequences of a verdict of not guilty by reason of mental nonresponsibility [insanity]."

In its Commentary to that Standard, the ABA notes the reasons espoused on both sides of the issue but concludes:

"Both stances are based on assumptions about jury knowledge and the effects of instructions. Given the absence of solid empirical data supporting either view, common sense and policy considerations must provide guidance. Providing for an instruction seems the most sensible approach given the potential for prejudice to defendants when the alternative course is followed. Particularly in cases in which defendants are charged with violent crimes (which is usually the case if the nonresponsibility issue is tried to a jury, as opposed to a judge), juries need to be told about the effect of a finding of mental nonresponsibility [insanity] if the possibility of a

serious injustice is to be avoided. The fear of compromise verdicts is misplaced."

(Footnote omitted.)

Maryland, to date, is in the majority camp. In *Brown v. State*, 8 Md.App. 462, 260 A.2d 665 (1970), the jury sent a note to the court inquiring whether the defendant, if found insane, would "be allowed to go free or will he be put in a mental institution." The court responded that, in that circumstance, "the disposition will be made by the Court in accordance with the law of Maryland." We rejected the defendant's attack on that response, holding, at 466, 260 A.2d 665:

"The information requested was in nowise relevant or material to the jury's function of determining the sanity *vel non* of appellant. Such determination could only be properly made by them on the evidence pertinent thereto before them; the disposition to be made by the court in the event that the jury determined appellant was insane could play no part therein. In such event the disposition of appellant was in the discretion of the court."

In *Tripp v. State*, 36 Md.App. 459, 374 A.2d 384, *cert. denied* 281 Md. 745 (1977), the trial court affirmatively instructed the jury that it was not to concern itself with the matter of punishment—that "[y]our job will be done after finding the defendant guilty or not guilty, sane or insane...." Citing *Lyles*, Tripp argued that the court should have instructed on the consequences of a verdict of insanity. See appellant's brief, S.T. 1976, No. 1028. We found no error, concluding at 484, 374 A.2d 384:

"The appellant, for transparent tactical reasons, wanted the jury to be assured that if they found the appellant not guilty by reason of insanity, the judge could still order him confined for further mental examination. The law, however, is clear that a jury is not in the business of rendering ultimate judgment but only in the business of resolving disputed facts and, therefore, should have no concern as to the consequences of its factfinding."

The Maryland Court of Appeals has yet to decide this issue. Given the clear and substantial division of authority, it is obviously a policy matter that should be decided by that Court.

■ We are not persuaded to depart from our own holdings in *Brown* and *Tripp.* They are consistent with the majority view around the country, and, despite both the substantive and procedural changes in the criminal responsibility ("insanity") law made in 1984 (see *Anderson v. Dep't of Health & Mental Hyg.*, 310 Md. 217, 528 A.2d 904 (1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1088, 99 L.Ed. 2d 247 (1988)), we see no compelling reason to embark on a new course. As the State observes, the gubernatorial Task Force that drafted the 1984 law considered proposing a statutory requirement that an instruction in this area be given but declined to make such a recommendation, opting instead to "inform the Governor and General Assembly that this was a closely divided question." Report of the Governor's Task Force to Review the Defense of Insanity (1983), p. 39. The Report not only included the proposed form of instruction that had been considered by the Task Force but also noted the view of the ABA. With that information before it, the General Assembly, presumably aware of the current state of the law, declined to require the instruction.

We have no doubt that some jurors, in their deliberations, may consider the consequences of their verdicts, although it is just as likely that they may consider the possibilities of probation, suspended sentences, or parole as the consequences of a verdict of non-responsibility. But, as the Iowa Court observed in *State v. Hamann,* 285 N.W.2d 180, 186 (Iowa 1979), "this does not justify our aiding and abetting it in that role. Rather, such a possibility merely tends to illustrate the necessity of precisely informing the jury of its proper function." Insofar as juror ignorance is concerned, we are inclined to agree with the Arkansas Court in *Madison v. State, supra,* 697 S.W.2d 106, that it may not be so deep as *Lyles* and the ABA imagine. The *Hinkley* case, in which the would-be assassin of President Reagan was found

not criminally responsible, produced a significant public debate over the consequences of such a finding, as indeed did a number of highly publicized cases in Maryland occurring more or less contemporaneously with *Hinkley*. Absent some empirical data more recent than the 1956 study by Mr. Weihofen (see *ante*), we are unwilling to assume that the public is ignorant in this matter or that they harbor the belief that dangerous persons will be released without restraint upon a finding of non-responsibility. Mr. Hinkley, of course, was not released, a fact that was widely reported in the local and national news media.

For these reasons, we find no reversible error in the court's initial rejection of appellant's requested instruction.

(2) *The Instruction—Second Request*

In the opening portion of his closing argument, the prosecutor commented on the law excusing a person from criminal responsibility by reason of mental disorder. He observed, several times and in several ways, that "there are times when a person commits a crime that they shouldn't be held responsible for that, but those are rare times, and they created this law for that reason. This is an excuse law."

No objection was made to any of these comments. At the conclusion of the prosecutor's opening portion, and before commencing his own argument, defense counsel renewed his request "for a Lyles instruction as a curative instruction," arguing that, by referring to the law as "an excuse law," the prosecutor had given the jury a "misleading impression" that "this totally excuses our behavior." The court denied the request.

Although the issue has not arisen very often, courts espousing the majority view have recognized that a *Lyles*-type instruction, while generally inappropriate, may be required where the jury has indeed been misinformed about the consequences of a finding of non-responsibility. The classic case of this was *Dipert v. State*, 259 Ind. 260, 286 N.E.2d 405 (1972). The defendant, 15 years old, killed his seven-year-old niece. While baby-sitting for her, he covered

her head with a sweatshirt, tied her hands behind her back, placed a sock in her mouth, and shot her with a shotgun. On *voir dire*, the prosecutor told a prospective juror that, if found not guilty by reason of insanity, the defendant would go "scot free." Though adhering generally to the majority view, the Court held, 286 N.E.2d at 407, that

> "[A] defendant, through an appropriate channel, such as a curative instruction or statement by the judge, will be entitled to inform the jury of such procedures [following a finding of not guilty by reason of insanity] where an erroneous view of the law on this subject has been planted in their minds."

■ *Dipert*, of course, was an extreme case. No other court in the majority camp, to our knowledge, has found the need to require the instruction as a curative measure. See, for example, *People v. Hebein*, 111 Ill.App.3d 830, 67 Ill. Dec. 546, 444 N.E.2d 782 (1982); *People v. Alerte*, 120 Ill.App.3d 962, 76 Ill.Dec. 452, 458 N.E.2d 1106 (1983), *cert. denied* 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1984); *Heald v. State*, 492 N.E.2d 671 (Ind.1986); *Ice v. Com.*, 667 S.W.2d 671 (Ky.), *cert. denied* 469 U.S. 860, 105 S.Ct. 192, 83 L.Ed.2d 125 (1984); *State v. Percy*, 146 Vt. 475, 507 A.2d 955 (1986). We see no need for it here. When viewed in a proper context, we do not believe that the prosecutor's comments represented either an erroneous statement of the law or suggested a consequence or disposition of any kind.

### (3) *Closing Argument*

■ At the end of the State's case-in-chief, defense counsel asked for the opportunity for sur-rebuttal in closing argument on the issue of criminal responsibility, i.e., he wanted to address the jury last on that issue.[9] He argued

---

9. Counsel suggested two alternatives:
   "I might suggest to the court that the way this has been dealt with in other courts in this State is to allow the Assistant State's Attorney to speak first, the defense to speak second, the Assistant State's Attorney to speak third, and that the defense was allowed sur rebuttal only on the issue of criminal responsibility.

that "since we bear the burden [on that issue] ... we should have the right to have the last word only with regard to criminal responsibility." The court denied the request.

In *Treece v. State*, 72 Md.App. 644, 532 A.2d 175 (1987), we rejected this very argument, holding at 661, 532 A.2d 175:

"Notwithstanding the allocation to the defendant of the burden of proving lack of criminal responsibility, the State in such cases, as in all criminal cases, carries the ultimate burden of proving guilt beyond a reasonable doubt. *See generally Pouncey v. State*, 297 Md. at 266–68, 465 A.2d 475. Indeed, only after having been convinced beyond a reasonable doubt that the accused is guilty of the crimes charged, does the jury need consider the defense of criminal responsibility and enter a special verdict thereon. *Id.* Because the State at all times carries the burden of proving guilt beyond a reasonable doubt, it is entitled to final argument."

Appellant seeks to distinguish *Treece* on two grounds: (1) that his request was made at the end of the State's case-in-chief and not, as in *Treece*, after the State had already made its rebuttal argument, and (2) unlike in *Treece*, his guilt was all but conceded, and the only real issue was criminal responsibility. We are unpersuaded.[10]

---

> Other courts have held that the State's Attorney should speak, the defendant speak and that the State's Attorney was allowed to rebut only with regard to the guilt or innocence, the actual participation in the crimes themselves."

10. In *Harris v. State*, 312 Md. 225, 539 A.2d 637 (1988), the Court discussed the right to make the opening and closing argument in the context of a capital sentencing proceeding. Although repeating language from earlier cases to the effect that the party holding the "affirmative of the issue ... has the right to begin and reply, both in the introduction of evidence and in the argument to the jury," the Court also confirmed that "in a criminal case the prosecution ordinarily bears the burden of persuasion and the burden of production and thus usually has 'the right to the first and last word in the trial.'" 539 A.2d at 652. We note that the Court of Appeals has issued a writ of *certiorari* in *Treece* and may consider the validity of our holding in

The timing of the defendant's request was not the basis for our holding in *Treece*, even though we characterized it as a "unique eleventh hour request." 72 Md.App. at 661, 532 A.2d 175. The basis of our holding, as made clear in the aforequoted language, was that the State retained the overall burden of proving guilt beyond a reasonable doubt. Moreover, notwithstanding his assertion to the contrary, appellant's guilt was *not* conceded. He never withdrew his pleas of not guilty; he urged that he had not intended to rob Ms. H but merely relieved her of her purse so that he could tie her hands, and that he had not used a handgun in the commission of a felony; and he was, in fact, acquitted of the handgun charge.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.

that case as to the right to make the final closing argument. Unless and until that aspect of *Treece* is reversed, however, we shall continue to follow it.